

# THE ATTORNEY GENERAL

## OF TEXAS

### AUSTIN 11, TEXAS

JOHN BEN SHEPPERD
ATTORNEY GENERAL

May 16, 1953

Hon. H. A. Hull, Chairman
House Committee on Privileges,
   Suffrage, and Elections
53rd Legislature
Austin, Texas

Opinion No. S-41

Re: Constitutionality of the
     method, if any, provided
     by Senate Bill 2 to fi-
     nance the presidential
     primary election this
     bill creates.

Dear Sir:

You have requested an opinion on two questions relating to Senate Bill 2, now being considered by your committee, as follows:

"(1) Does the bill purport to provide for a manner of financing the primary it creates?

"(2) If, in fact, the responsibility of financing would fall on the State and/or County Govern- ment, would this provision be constitutional in view of the fact that the primary is strictly a party function?"

Senate Bill 2 is commonly referred to as the Presiden- tial Preference Primary Bill. It provides for the holding of a primary on the second Saturday in June of each presidential election year for the election of delegates to the national convention of each political party whose nominee for Governor in the last preceding general election received as many as 25,000 votes. It also provides for voting on presidential and vice-presidential candidates and binds the delegates to vote for the successful candidates on the first ballot at the national convention.

This election is to be proclaimed by the Governor and ordered by the county judges of the respective counties, and writs of election and notices are to be issued and published as provided by law for general elections. The election is to be held by the general election officials named by the commis- sioners' court, and the officers are to receive the same fees, allowances and wages as in general elections. Ballots are to be prepared by the Secretary of State, and returns of the elec- tion are to be canvassed by the commissioners' court of each county and then forwarded to the Secretary of State in the

manner and within the time prescribed for general elections, to be finally canvassed by that officer. Applications for placing the names of candidates on the ballot are to be filed with the Secretary of State, and there must be paid for each candidate a filing fee which the Secretary of State is required to pay and deliver to the "General Fund." We take it that the fund referred to is the General Revenue Fund of the State. However, no provision is made for keeping these fees separate from other moneys in the Fund which are derived from taxation or for disbursement of the fees to help defray the costs of the election. We might also observe that the total collections would probably be far less than the expenses incident to the election.

Section 5 of the bill reads as follows:

"Arrangements and Expenses of Election. The laws of this State relating to ballot boxes, stub boxes, voting booths, guard rails and other election supplies for general elections, and the guarding, checking, distribution, safekeeping and storage of same, shall apply likewise to such primary elections."

Section 77 of the Texas Election Code (Article 7.12, Vernon's Election Code) provides:

"All expenses incurred in furnishing the supplies, ballots, and booths in any general or special election shall be paid for by the county, except costs in municipal and school elections. All accounts for supplies furnished and services rendered shall first be approved by the Commissioners Court before they are paid by the county."

It is seen that the election, although termed a primary, is to be conducted much in the same way that general state-wide elections are conducted. We believe the intent of Section 5 of the bill is to make the provisions of Section 77 of the Election Code, placing the expenses of general elections on the counties, applicable to these primary elections. Section 77, although referring to accounts for "services rendered," may not cover payment for services of election officials but may refer only to other types of services. However, Section 22 of the Election Code provides that the pay of judges and clerks of general elections shall be determined by the commissioners' court of the county where the services are rendered, and that their compensation shall be paid by the county treasurer upon order of the commissioners. We believe a reasonable interpretation of the provision in Section 4 of Senate Bill 2 which states that "such

officers shall receive the same fees, allowances, and wages as in general elections" is that not only the rate of pay but the source of pay is to be the same as in general elections.

In answer to your first question, then, our conclusion is that Senate Bill 2 does purport to provide a manner for financing the primary it creates, namely, by each county's paying the expenses of the election in that county in the same manner as expenses of a general election are paid.

In your second question you ask whether the responsibility for financing this type of election may be placed on the state or county government. In Waples v. Marrast, 108 Tex. 5, 184 S.W. 180 (1916), the Supreme Court of Texas held that a provision in the Presidential Preference Primary Law of 1913 (Acts 33rd Leg., 1913, ch. 46, p. 88) requiring the counties to pay the expenses of the election violated Section 52, Article III and Section 3, Article VIII of the Texas Constitution. Section 3 of Article VIII provides that taxes shall be levied and collected for public purposes only, and Section 52 of Article III prohibits the granting of public money in aid of, or to, any individual, association, or corporation. The gist of the opinion is that political parties are voluntary associations and not governmental instrumentalities, and that the holding of their primaries is not a public purpose in the sense in which the term is employed as a limitation upon the State's power of taxation. The courts of this State have consistently adhered to this concept of the nature of political parties in subsequent decisions. Bell v. Hill, 123 Tex. 531, 74 S.W.2d 113 (1934); McCombs v. Stevenson, 195 S.W.2d 566 (Tex.Civ.App. 1946); Wall v. Currie, 147 Tex. 127, 213 S.W.2d 816 (1948).

In 1944 the Supreme Court of the United States held in Smith v. Allwright, 321 U.S. 649, that the exclusion of Negroes from the Democratic primaries in Texas through a rule adopted by the state convention of that party was in violation of the Fifteenth Amendment to the Federal Constitution, which declares that the rights of citizens to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude. The court said that the statutory system in Texas for the selection of party nominees for inclusion on the general election ballot makes the party which is required to follow these legislative directions an agency of the State insofar as it determines the participants in a primary election. "If the State requires a certain electoral procedure, prescribes a general election ballot made up of party nominees so chosen and limits the choice of the electorate in general elections for state

office, practically speaking, to those whose names appear on such a ballot, it endorses, adopts and enforces the discrimination against Negroes, practiced by a party entrusted by Texas law with the determination of the qualifications of participants in the primary. This is state action within the meaning of the Fifteenth Amendment." 321 U.S. at 664.

Smith v. Allwright involved solely the question of whether party action in excluding Negroes from a primary election was in violation of the Federal Constitution. Directly, the decision had no effect whatever on the question of whether the primary was a public purpose within the meaning of the Constitution of this State. It did compel a revision in the decisions of the Texas courts on the power of a political party to prescribe the qualifications of its members, and it overruled Bell v. Hill. To what extent this enforced revision of the concept of a political party's powers might affect the decision in Waples v. Marrast is brought to our attention by the holding of the Supreme Court of Arkansas in Adams v. Whittaker, 195 S.W.2d 634 (Ark.Sup. 1946). In that case the court took the view that Smith v. Allwright in effect overruled Waples v. Marrast, and, relying on the Allwright case, held that the expenses of a party primary could be paid out of public funds.

It is within the province of the courts of this State to place their own interpretation upon the provisions of the Texas Constitution. Even if the Supreme Court of the United States or the courts of other States might be of the opinion that the holding of party primaries is a public purpose which may be supported by taxation, the Supreme Court of this State would still be free to give a different construction to prohibitions in our State Constitution. See 21 C.J.S., Courts, §§ 204, 205. However, upon analyzing the holding in Smith v. Allwright we are unable to agree with the view taken by the Arkansas court that this decision had a bearing on the question before us. The Allwright case held, in effect, that the State, by permitting political parties to place candidates on the general election ballot and by requiring them to make their nominations in a certain way, had placed the parties within the regulatory power of the State to such an extent that party action became state action insofar as participation in the selection of nominees was concerned. We do not think the opinion was intended to mean that the parties became instrumentalities of the state government in the sense that the State had any duty to maintain and finance their activities. It meant only that a party, by being given a voice in the elective process of the State, must conform to the same constitutional restrictions which are imposed upon the State itself.

This interpretation of the import of the decision is borne out in Mr. Justice Clark's concurring opinion in Terry v. Adams, decided by the Supreme Court of the United States on May 4, 1953 (21 U.S. Law Week 4346), wherein he said:

> "In Smith v. Allwright, 321 U.S. 649 (1944), this Court held that the Democratic Party of itself, and perforce any other political party, is prohibited by that Amendment from conducting a racially discriminatory primary election. By the rule of that case, any 'part of the machinery for choosing officials' becomes subject to the Constitution's restraints. Id., at 664. There, as here, we dealt with an organization that took the form of 'voluntary association' of unofficial character. But because in fact it functioned as a part of the state's electoral machinery, we held it controlled by the same constitutional limitations that ruled the official general election."

In Terry v. Adams the Supreme Court extended the holding of Smith v. Allwright to primaries of a political organization which were conducted entirely outside the framework of the State's regulatory measures, in which "formal State action, either by way of legislative recognition or official authorization, is wholly wanting." (21 U.S. Law Week 4351.) If Smith v. Allwright had the effect of making the Democratic primary a state function which could be financed out of public tax money, Adams v. Terry has made the totally unauthorized and unrecognized primary of the Jaybird Party a state function which likewise could be financed by taxation. The mere statement of such a contention is its own refutation.

Our evaluation of the course of judicial decision since Waples v. Marrast is that there has been nothing in the cases to lead us to believe that the Supreme Court of Texas would now overrule that case. Accordingly, our answer to your second question is that a statutory provision requiring the payment of the expenses of the primary created by Senate Bill 2 out of public funds raised by taxation is unconstitutional.

However, we would like to point out that we see no constitutional objection to the financing of the election, administered by state or county officials, out of a fund made up of the filing fees of the candidates supplemented by assessments against the participating parties, a registration fee against participating voters, or some other similar means. Furthermore, the impediment to payment of the expenses of the election in the manner presently contemplated in Senate Bill 2 could be cured by the adoption of a constitutional amendment.

## SUMMARY

Senate Bill 2 of the 53rd Legislature, the Presidential Preference Primary Bill, purports to provide for the payment of the expenses of the election which it creates out of county funds in each county in the same manner as expenses of a general election are paid.

A statutory provision requiring the payment of the expenses of the primary created by Senate Bill 2 out of public funds raised by taxation is unconstitutional. Waples v. Marrast, 108 Tex. 5, 184 S.W. 180 (1916). However, there would be no constitutional objection to the financing of the election out of a fund made up of the filing fees of the candidates supplemented by assessments against the participating parties, a registration fee against participating voters, or some other similar means. Furthermore, the impediment to the payment of the expenses of the election in the manner presently contemplated in Senate Bill 2 could be cured by the adoption of a constitutional amendment.

APPROVED:

Willis E. Gresham
Reviewer

Robert S. Trotti
First Assistant

John Ben Shepperd
Attorney General

MKW:s

Yours very truly,

JOHN BEN SHEPPERD
Attorney General

By _Mary K Wall_

Mary K. Wall
Assistant